UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 21-cv-60408-BLOOM/Valle

REICHEN KUHL, *as owner of the 2002 28-foot*
*Four Winns 280 Horizon motorboat, HIN*
*GFNCE005F102*,

    Petitioner.

_____/

**OMNIBUS ORDER ON REICHEN KUHL'S AND
SUNTEX MARINA INVESTORS LLC'S MOTIONS FOR SUMMARY JUDGMENT**

**THIS CAUSE** is before the Court upon the Motions for Summary Judgment filed by Limitation Petitioner Reichen Kuhl ("Kuhl"), ECF No. [148], and Defendants Suntex Marina Investors, LLC and Rahn Marina, LLC, Bahia Mar SMI OPCO Series (collectively, "Suntex"), ECF No. [151], (collectively, "Motions"). The Court has carefully reviewed the Motions, all opposing and supporting memoranda, ECF Nos [160], [162], [168], [169], the record in this case, the applicable law, and is otherwise fully advised. For the reasons that follow, the Motions are denied.

**I.**    **BACKGROUND**

This case arises due to a January 2021 fire that broke aboard Kuhl's motorboat (the "Limitation Vessel") after docking at Bahia Mar Marina for fueling. Suntex is the owner of Bahia Mar Marina. When in flames, the Limitation Vessel drifted into the M/Y *W*, a 189' Feadship vessel owned by Claimant Seven LXXVII, LLC ("Seven"). The *W* spent weeks in a repair yard, which Seven claims resulted in lost charter income of between $1.2 million and $2 million.

On February 22, 2021, Kuhl, as title owner of the Limitation Vessel, initiated this action for exoneration from or for limitation of liability pursuant to 46 U.S.C. §§ 30501, *et seq.*,

Supplemental Rule F, and Local Supplemental Rule F for all claims arising out of the fire incident. ECF No. [1]. Seven filed a counterclaim against Kuhl, ECF No. [27], and a third-party claim against Suntex, ECF No. [45], seeking compensation for physical damages to the *W* and lost charter income. However, because an insurance company paid for the physical damage to the *W*, Seven is seeking damages in this case only for lost charter income. ECF No. [147] ¶¶ 41–42.

The only issue on the parties' Motions for Summary Judgment is whether there is a genuine issue of material fact as to whether Seven suffered lost charter income.

## II. MATERIAL FACTS

Based on the parties' respective statements of material facts in support of and in opposition to the Motions and the evidence in the record, the following facts are not genuinely in dispute unless otherwise noted.[1]

Seven owns the *W*, a 189' Feadship. ECF No. [147] ¶ 5. Seven has one member, David MacNeil. *Id.* ¶ 6. The *W* is a private, pleasure yacht, flagged in the United States and registered with the United States Coast Guard as a recreational vessel. ECF Nos. [147] ¶ 8, [151] at 3 ¶ 3. Seven purchased the *W* in July 2019. ECF Nos. [147] ¶ 7, [151] at 3 ¶ 1. After the purchase, the *W* underwent a retrofit, which was completed around September 2020. ECF Nos. [147] ¶ 10, [151] at 3 ¶ 2.

On July 1, 2020, Seven entered into a Charter Agency Agreement with Northrop &

---

[1] Kuhl filed a Statement of Material Facts, ECF No. [147]; Seven filed a Counter Statement of Material Facts in Opposition, along with additional facts, ECF No. [159]; and Kuhl filed a Reply Statement of Material Facts, ECF No. [167]. Suntex did not file a separate statement of material facts, but incorporated a statement within its Motion for Summary Judgment, ECF No. [151] at 3–4, in violation of Southern District of Florida Local Rule 56.1(a)(1). Seven filed a Counter Statement of Material Facts in Opposition. ECF No. [161]. Suntex then filed a Statement of Facts in Opposition to Seven's Counter Statement. ECF No. [170]. Suntex's Reply Statement contained additional facts, which the Local Rules do not contemplate. *See* S.D. Fla. L.R. 56.1(b)(3). Moreover, in its Reply memorandum of law, Suntex contradictorily states that it "elects not to challenge, argue-against [sic] or dispute [Seven's] supposed Material Facts in this Reply." ECF No. [169]. At bottom, however, disputed issues of fact preclude summary judgment.

Johnson. ECF Nos. [147] ¶ 11, [151] at 3 ¶ 4. The *W's* charters are managed by Adam Fitzmaurice, the Senior Charter Manager for Northrop & Johnson. ECF Nos. [147] ¶ 14, [159] ¶ 52, [161] ¶ 17. Fitzmaurice was designated as Seven's Rule 30(b)(6) witness on the issue of damages and disclosed by Seven as its expert witness. ECF No. [147] ¶¶ 15–16. Fitzmaurice has more than twenty years of experience in the yachting industry, both as crew and in charter management, and he has been involved in the charter of luxury yachts since January 2015. ECF Nos. [159] ¶ 52, [161] ¶ 17. Fitzmaurice also worked as charter manager for two other Westport Motor Yachts beneficially owned by MacNeil. ECF No. [159] ¶ 58.

Fitzmaurice stated that, in the yachting industry, the "summer" season runs from May through October and the "winter" season runs from November through April. ECF No. [147] ¶ 18. The summer season in the Caribbean and Florida has no high and low seasons, and the "high winter" season consists of the two weeks over the Christmas and New Year holidays. *Id.* ¶¶ 19–20.

On September 28, 2020, Northrop and Johnson issued a press release regarding the *W* being available for charter in the Bahamas, Caribbean, Florida, and New England in the summer with charters starting at $400,000.00. ECF Nos. [159] ¶ 49. Northrop & Johnson marketed the *W* for charters in the fall and winter of 2020. ECF No. [147] ¶ 13. The *W* was available to charter in the Caribbean and Florida in the winter of 2020–2021. *Id.* ¶ 17.

On December 20, 2020, the *W* departed Bahia Mar Marina and traveled to the Caribbean, where MacNeil and his family spent the Christmas and New Year's holidays. ECF Nos. [147] ¶ 22, [151] at 3 ¶ 8. Northrop & Johnson, through Fitzmaurice, presented MacNeil with two charter offers for the 2020–2021 holiday season, both of which MacNeil declined. ECF No. [147] ¶ 23. The *W* was not chartered during the 2020 holidays because MacNeil was using the *W* with his

family, and there was no time to pick up a charterer who had inquired about using the *W* at that time. ECF No. [159] ¶ 51.

On January 6, 2021, Fitzmaurice suggested adjusting the low season charter hire rate of the *W* to $355,000.00 per week. ECF No. [147] ¶ 24. In early January 2021, the published charter rate for the *W* was $355,000.00 per week. *Id.* ¶ 46. After the holidays, the *W* returned to the Bahia Mar Marina, arriving on January 12, 2021. *Id.* ¶ 25. From the date of its purchase through the date of the fire on January 17, 2021, the *W* had not been chartered and had no charter bookings. ECF Nos. [147] ¶¶ 27, 38, [151] at 3 ¶¶ 5, 7, 10.

On January 17, 2021, Kuhl took the Limitation Vessel out on the water for the first time, traveling from his residence to the fuel dock at the Bahia Mar Marina. ECF No. [147] ¶ 2. The Limitation Vessel caught fire after fueling, became fully engulfed, burned through her mooring line, and drifted down the dock and under the hull of the *W*. *Id.* ¶¶ 3–4. A few days after the fire, the *W* was taken to Rybovich boatyard for repairs. ECF Nos. [147] ¶ 28, [151] at 3 ¶ 11. The *W* returned to Bahia Mar on March 19, 2021. ECF No. [147] ¶ 29. The *W* was unavailable to charter for approximately nine weeks. *Id.* ¶ 30.

On March 24, 2021, the *W* traveled to the Bahamas and was in use by MacNeil for approximately two weeks. *Id.* ¶ 32. After March 2021, the *W* chartered five times in the Bahamas and Miami during the 2021 summer season: (1) May 22 through May 29 (Bahamas); May 31 through June 7 (Bahamas); June 20 through June 27 (Bahamas); July 1 through July 8 (Miami); and October 14 through 18 (Bahamas). *Id.* ¶¶ 33–36. Two charter agreements for the 2021 holiday season were also executed, to take place between December 20, 2021, and January 7, 2022, in St. Maarten. *Id.* ¶ 37. The first time the W chartered since its purchase in July 2019 was May 22, 2021. ECF Nos. [147] ¶ 39, [151] at 3 ¶ 13.

Seven is claiming a loss of between three and five weeks of charter due to the fire and that the *W* chartered at $400,000.00 per week during that time, leading to a lost charter income of between $1.2 million and $2 million. ECF No. [147] ¶ 44. Fitzmaurice's professional opinion as a charter manager is that, but for the fire, the *W* would have chartered between three and five times in January 2021 through March 2021. ECF Nos. [159] ¶ 55; *see* ECF No. [147-4] at 124. Fitzmaurice testified that in the Fall of 2020, there was a spike in demand for charters due to restrictions from COVID-19. ECF Nos. [159] ¶ 56, [161] ¶ 18. Fitzmaurice further testified that MacNeil's previous yachts had been chartered and that MacNeil "was very keen to charter his yachts." ECF No. [147-4] at 36–38, [159] ¶ 58. Before purchasing the *W*, MacNeil had conversations with Fitzmaurice about chartering the vessel. ECF Nos. [159] ¶ 59, [161] ¶ 24.

Fitzmaurice further testified that between January 11, 2021, and February 8, 2021, he received nineteen charter inquiries regarding the *W*. ECF No. [159] ¶ 61, [161] ¶ 26. Those inquiries included two charters for January 2021, four for February 2021, and six for March 2021. ECF No. [159] ¶ 61, [161] ¶ 26. Seven points out that Fitzmaurice testified that three charter inquiries—for January 19 to January 23, January 26 to February 3, and February 22 to March 6— represented inquiries that wanted to book the *W* but could not due to the fire damage. ECF No. [159] ¶ 61, [161] ¶ 26. Concerning those charters, Kuhl responds that Fitzmaurice further testified that he believed MacNeil would not have considered a four-day charter and that, regarding the third charter, the broker inquiring about the *W*'s availability wanted to negotiate or discount the price, which Fitzmaurice testified MacNeil did not like to do. ECF No. [167] ¶ 51. Suntex responds that Fitzmaurice's "testimony made it very clear that only one or two [e]nquiries were even in the realm of possibility of giving rise to a charter." ECF No. [170] ¶ 26.

The *W's* Captain, Marc Alan Wellnitz, testified that in 2021, [t]here was a lot of demand

5

for charters and we certainly were busy during that period." ECF No. [147-3] at 67–68. MacNeil similarly testified that charter inquiries followed rapidly after the *W* was fixed due to the large demand for U.S. flagged vessels. ECF Nos. [147-2] at 43, [159] ¶ 63. After the fire damage was repaired, the *W* was chartered a total of four times within approximately six weeks. ECF Nos. [159] ¶ 64, [161] ¶ 29.

### III. LEGAL STANDARD

A court may grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The parties may support their positions by citation to the record, including, *inter alia*, depositions, documents, affidavits, or declarations. *See* Fed. R. Civ. P. 56(c). An issue is genuine if "a reasonable trier of fact could return judgment for the non-moving party." *Miccosukee Tribe of Indians of Fla. v. United States*, 516 F. 3d 1235, 1243 (11th Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)). A fact is material if it "might affect the outcome of the suit under the governing law." *Id.* (quoting *Anderson*, 477 U.S. at 247-48). The court views the facts in the light most favorable to the non-moving party and draws all reasonable inferences in the party's favor. *Crocker v. Beatty*, 886 F.3d 1132, 1134 (11th Cir. 2018). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which a jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252. The Court does not weigh conflicting evidence. *See Skop v. City of Atlanta, Ga.*, 485 F.3d 1130, 1140 (11th Cir. 2007) (quoting *Carlin Comm'n, Inc. v. S. Bell Tel. & Tel. Co.*, 802 F.2d 1352, 1356 (11th Cir. 1986)).

The moving party shoulders the initial burden to demonstrate the absence of a genuine issue of material fact. *See Shiver v. Chertoff*, 549 F.3d 1342, 1343 (11th Cir. 2008). If a movant

satisfies this burden, "the nonmoving party 'must do more than simply show that there is some metaphysical doubt as to the material facts.'" *Ray v. Equifax Info. Servs.*, L.L.C., 327 F. App'x 819, 825 (11th Cir. 2009) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). Instead, "the non-moving party 'must make a sufficient showing on each essential element of the case for which he has the burden of proof.'" *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). The non-moving party must produce evidence, going beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designating specific facts to suggest that a reasonable jury could find in the non-moving party's favor. *Shiver*, 549 F.3d at 1343.

In resolving the issues presented under Fed. R. Civ. P. 56, "the court may not weigh conflicting evidence to resolve disputed factual issues; if a genuine dispute is found, summary judgment must be denied." *Carlin Commc'n, Inc.*, 802 F.2d at 1356; *see also Aurich v. Sanchez*, No. 08-80113-CIV, 2011 WL 5838233, at *1 (S.D. Fla. Nov. 21, 2011) ("If a reasonable fact finder could draw more than one inference from the facts, and that inference creates an issue of material fact, then the court must not grant summary judgment." (citing *Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913 (11th Cir. 1993)). Even "where the parties agree on the basic facts, but disagree about the factual inferences that should be drawn from those facts," summary judgment may be inappropriate. *Warrior Tombigbee Transp. Co., Inc. v. M/V Nan Fung*, 695 F.2d 1294, 1296 (11th Cir. 1983).

Furthermore, summary judgment is inappropriate where the Court would be required to weigh conflicting renditions of material fact or determine witness credibility. *See Hairston*, 9 F.3d at 919; *see also Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996) ("It is not the court's role to weigh conflicting evidence or to make credibility determinations; the non-

7

movant's evidence is to be accepted for purposes of summary judgment."); *see also Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1154 (11th Cir. 2012) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he [or she] is ruling on a motion for summary judgment or for a directed verdict." (quoting *Anderson*, 477 U.S. at 255)); *Gary v. Modena*, No. 05-16973, 2006 WL 3741364, at *16 (11th Cir. Dec. 21, 2006) (Fed. R. Civ. P. 56 precludes summary judgment where court would be required to reconcile conflicting testimony or assess witness credibility); *Ramirez v. Nicholas*, No. 13-60820-CIV, 2013 WL 5596114, at *4 (S.D. Fla. Oct.11, 2013) ("The Court may not make the credibility determinations needed to resolve this conflict; only the jury may do so."). Through this lens, the Court considers the Motion.

**IV.   DISCUSSION**

"[T]he law is well settled that 'the loss of profits for the use of a vessel pending repairs, or other detention, arising from a collision or other maritime tort, and commonly spoken of as "demurrage," is a proper element of damage.'" *Cent. State Transit & Leasing Corp. v. Jones Boat Yard, Inc.*, 206 F.3d 1373, 1376 (11th Cir. 2000) (quoting *The Conqueror*, 166 U.S. 110, 125 (1897)). But "[i]t is equally well settled . . . that demurrage will only be allowed when profits have actually been, or may be reasonably supposed to have been, lost, and the amount of such profits is proven with reasonable certainty." *Id.* (quoting *The Conqueror*, *supra*). The Eleventh Circuit has not squarely addressed lost charter income for "boats that are put to multiple uses—some personal, some commercial." *MY. P.I.I. LLC v. H&R Marine Eng'g, Inc.*, 544 F. Supp. 3d 1334, 1341 (S.D. Fla. 2021). But as recently explained in *MY. P.I.I.*, "in such cases, courts typically examine the *kind* of use, rather than the registration, to determine the viability of the plaintiff's damages claim." *Id.* (citing with approval *Sharp v. Hylas Yachts, LLC*, 872 F.3d 31, 40 (1st Cir. 2017) and *Oswalt v.*

*Resolute Indus., Inc.*, 642 F.3d 856, 864 (9th Cir. 2011)).

In *MY. P.I.I.*, the Court denied the defendant's summary judgment motion on the issue of lost charter income for a registered recreational vessel, because the plaintiff "adduced evidence that, from 2014 through the 2019 repairs, it chartered the Vessel commercially on a fairly regular (if not entirely consistent) basis." *Id.* at 1342. The Court explained that "the standard 'that a shipowner offer proof of loss is not equivalent to a requirement that he prove the loss of a specific charter at a definite time and place.'" *Id.* at 1343 (quoting *Skou v. United States*, 478 F.2d 343, 346 (5th Cir. 1973)). Instead, "[a] shipowner may satisfy his obligations 'if he shows a state of facts from which a court or jury can find that there was an opportunity for him to do so, and that he would have availed himself of it.'" *Id.* at 1343–44 (quoting *Skou*, *supra*).

Also instructive is *Sharp*, where the First Circuit rejected the defendant's argument that "the reasonable certainty standard can only mean that to be awarded damages for lost profits, a recreational vessel must have a history of income," and that "[a]bsent such history, these damages are too speculative and cannot be awarded." *Sharp*, 872 F.3d at 40 (internal quotation marks omitted). The court explained that "no court has crafted so strict a rule"; "[i]nstead, courts have consistently observed that 'what constitutes "reasonable certainty" is of necessity a fact-intensive inquiry in which the issue of evidentiary sufficiency can only be determined on a case-by-case basis.'" *Id.* (quoting *Yarmouth Sea Prod. Ltd. v. Scully*, 131 F.3d 389, 395 (4th Cir. 1997)). The court in *Sharp* allowed the question of damages to reach the jury even though the yacht was chartered only after the plaintiff sued, explaining that "[t]he fact that [chartering] occurred after suit was filed is a talking point for Hylas's attorney." *Id.*

Kuhl and Suntex argue that Seven has failed to prove the possibility of lost charter income with reasonable certainty, because the *W* had not been chartered before the fire, and there was no

charter agreement signed during the time of repairs. ECF Nos. [148], [151]. Seven responds that there are sufficient facts regarding lost charter income to submit the issue to the jury. ECF Nos. [158], [160]. Seven is correct.

Seven has adduced sufficient evidence to present the fact-intensive question of lost charter income to the jury. Fitzmaurice, the Senior Charter Manager for the *W's* charter broker, Northrop & Johnson, testified that MacNeil's previous yachts had been chartered in the past and that MacNeil "was very keen to charter his yachts." ECF No. [147-4] at 36–38, [159] ¶ 58. Before purchasing the *W*, MacNeil had conversations with Fitzmaurice about chartering the vessel. ECF Nos. [159] ¶ 59, [161] ¶ 24. As early as July 1, 2020, Seven entered into a Charter Agency Agreement with Northrop & Johnson. ECF Nos. [147] ¶ 11, [159] ¶ 48, [151] at 3 ¶ 4, [161] ¶ 14. Northrop and Johnson advertised the *W* for charter in September 2020, at a rate of $400,000.00 a week. ECF Nos. [159] ¶ 49, [161] ¶ 15. According to Fitzmaurice, between January 11, 2021, and February 8, 2021, he received nineteen charter inquiries regarding the *W*, ECF No. [159] ¶ 61, [161] ¶ 26, three of which fell through because of the fire. ECF No. [159] ¶ 61, [161] ¶ 26. Moreover, the *W* eventually chartered five times in the Bahamas and Miami during the 2021 summer season, ECF No. [147] ¶¶ 33–36, with two executed charter agreements for the 2021 holiday season, *id.* ¶ 37.

In addition, Fitzmaurice, Captain Wellnitz, and MacNeil testified that COVID-19 restrictions had driven increased demands for charters in 2020 and 2021. ECF Nos. [147-3] at 67–68, [159] ¶¶ 56, 63, [161] ¶¶ 18, 28. Fitzmaurice, who has more than twenty years of experience in the yachting industry, ECF Nos. [159] ¶ 52, [161] ¶ 17, opined that, but for the fire, the *W* would have chartered between three and five times between January 2021 and March 2021. ECF Nos. ECF No. [147-4] at 124, [159] ¶ 55. And MacNeil testified that after the *W* was fixed, charter

inquiries followed rapidly due to the large demand for U.S.-flagged vessels. ECF Nos. [147-2] at 43, [159] ¶ 63.

Based on this record, Seven has presented "a state of facts from which a court or jury can find that there was an opportunity for [Seven] to [charter the *W*], and that [it] would have availed himself of it.'" *MY. P.I.I.*, 544 F. Supp. 3d at 1343–44. The *W*'s beneficial owner had a history of chartering predecessor yachts; the *W* was actively being advertised for chartering in a market with unusually high demand; and the *W* was booked for charters shortly after repairs. Notably, as the court in *MY. P.I.I.* observed, "the standard that a shipowner offer proof of loss is not equivalent to a requirement that he prove the loss of a specific charter at a definite time and place." *MY. P.I.I.*, 544 F. Supp. 3d at 1343.

Kuhl and Suntex understandably highlight facts that may convince a jury that Seven did not suffer lost charter income while the *W* was being repaired. For instance, the *W* is registered for recreational purposes only. ECF Nos. [147] ¶ 8, [151] at 3 ¶ 3. MacNeil rejected two charter offers for the 2020–2021 holiday season, which is considered the high season for winter yachting in the Caribbean and Florida. ECF No. [147] ¶¶ 19–20, 23. On January 6, 2021, Fitzmaurice suggested adjusting the low season charter hire rate of the *W* to $355,000.00 per week, ECF No. [147] ¶ 24, suggesting that the higher $400,000.00 rate was driving away bookings. MacNeil may have been hesitant to consider shorter, four-day charters or negotiate or discount prices. ECF No. [167] ¶ 51. And the first time the *W* chartered since its purchase in July 2019 was in May 2021. ECF Nos. [147] ¶ 39, [151] at 3 ¶ 13.

These counter-facts are "talking points" for the jury and not dispositive of the issue of damages as a matter of law. *See Sharp*, 872 F.3d at 40. There is no bright-line rule precluding damages for lost charter income simply because there is no prior history of charters. *Id.* Although

the plaintiff in *MY. P.I.I.* did present a history of prior charter bookings, the damages issue is necessarily "a fact-intensive inquiry in which the issue of evidentiary sufficiency can only be determined on a case-by-case basis.'" *Sharp*, 872 F.3d at 4. So while a jury might reject Seven's damages claim due to the absence of a history of bookings, that is not for this Court to decide as a matter of law.

Kuhl's and Suntex's reliance on *Shackleford v. Sailor's Wharf, Inc.*, No. 8:15-CV-407-T-33TBM, 2016 WL 4247946 (M.D. Fla. Aug. 11, 2016), is misplaced. In *Shackleford*, the plaintiff "ground[ed] his calculations for lost profits on normal charter rates in Hawaii for a similar vessel on the basis that he intends to make future commercial use of Sea the World under a newly founded Hawaiian Corporation." *Id.* (internal quotation marks omitted). As outlined above, however, Seven proffered significantly more evidence to support its lost charter income claim. Other district court decisions relied upon by Kuhl and Suntex are distinguishable for the same reason (and because of their different procedural postures). *See E. Shore Marine, Inc. v. Platt*, No. CA 08-0023-CG-C, 2008 WL 11425654, at *8 (S.D. Ala. Sept. 22, 2008) (describing the "naked assertion on the part of Mr. Platt that he was contemplating different uses for his newly-purchased vessel marks his claim for loss of use of his vessel as the exact sort of blind speculation [prohibited by] *Twombly*."); *Gladsky v. Sessa*, No. CV 06-3134 ETB, 2007 WL 2769494, at *5 (E.D.N.Y. Sept. 21, 2007) ("The damages that defendant claims are purely speculative and pertain solely to lost future income, which he bases on 'the rates charged by similar vessels' and not on the earning history of his vessel itself."); *Nordasilla Corp. v. Norfolk Shipbuilding & Drydock Corp.*, 1982 AMC 99, 104–05 (E.D.Va.1981) (refusing to award damages after a trial "for loss of use of a pleasure craft which had no history of income and which was never intended to be used for anything other than the pleasure of its owner's shareholders").

## V. CONCLUSION

For the foregoing reasons, Kuhl's and Suntex's Summary Judgment Motions, **ECF No. [148], [151]**, are **DENIED**.

**DONE AND ORDERED** in Chambers at Miami, Florida, on March 29, 2022.

_____
**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to:
Counsel of Record