# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## Case No. 21-cv-60408-BLOOM/Valle

REICHEN KUHL, *as owner of the 2002 28-foot*
*Four Winns 280 Horizon motorboat, HIN*
*GFNCE005F102,*

      Petitioner.

_____/

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

**THIS CAUSE** is before the Court following a two-day bench trial held on April 12, 2022

and April 13, 2022. ECF Nos. [193], [195]. The Court has carefully considered the evidence

presented at trial and the applicable law. Set forth below are the Court's relevant findings of fact

and conclusions of law.

## I. INTRODUCTION

This case arises due to a fire that took place aboard a 2002 28-foot Four Winns, 280

Horizon motorboat ("Limitation Vessel" or "Four Winns") after Petitioner Reichen Kuhl ("Kuhl")

docked at Bahia Mar Marina (the "Marina") to fuel the Limitation Vessel on January 17, 2021.

Following fueling, an explosion and resulting fire occurred in the Limitation Vessel's engine

space. As a result, Kuhl was injured, the Limitation Vessel was destroyed, a motor yacht moored

behind the Limitation Vessel, the M/Y "W" sustained damage, and the Marina fuel dock was

damaged. The M/Y "W" is owned by claimant Seven LXXVII, LLC ("Seven"). Suntex Marina

Investors, LLC ("Suntex") is the owner of the Marina. Rahn Marina LLC, Bahia Mar SMI OPCO

Series ("Rahn"), is a wholly owned subsidiary of Suntex and operated the Marina.

On February 22, 2021, Kuhl, as titled owner of the Limitation Vessel, initiated this action

for exoneration from or limitation of liability pursuant to 46 U.S.C. §§ 30501, *et seq.* ("Limitation

of Liability Act" or "Act"), Supplemental Rule F, and Local Supplemental Rule F for all claims arising out of the fire incident. *See* ECF No. [1]. Seven filed a counterclaim for negligence against Kuhl, ECF No. [27], and a third-party complaint against Suntex, asserting claims for negligence and gross negligence, ECF No. [45], and seeking compensation for lost charter income.[1] The claims pending before the Court are Kuhl's petition for exoneration or limitation, Seven's claim of negligence against Kuhl, and Seven's claim of gross negligence against Suntex, which proceeded to a bench trial.[2]

At trial, the parties agreed to bifurcate the issues of liability and damages, with Seven bearing the initial burden of proof regarding Kuhl's limitation action and the burden of proof on its gross negligence claim against Suntex. Following the presentation of Seven's evidence on liability, both Kuhl and Suntex moved for judgment on partial findings pursuant to Rule 52(c) of the Federal Rules of Civil Procedure. The Court denied Kuhl's and Suntex's motions. Thereafter, Kuhl and Suntex presented evidence on liability and rested, concluding the liability portion of the trial. Kuhl and Suntex renewed their motions for judgment as a matter of law, and the Court directed the parties to submit proposed findings of fact and conclusions of law.

---

[1] Suntex filed an Amended Rule F(5) Claim, ECF No. [71], asserting claims against Kuhl, which were settled and thus not tried to the Court. *See* ECF No. [129]. In addition, the claims of Ace American Insurance Company, as subrogee of Seven, against Kuhl for physical damage to the W, and its crossclaims against Suntex, were also resolved through settlement. *Id.*

[2] The Court previously determined that the exculpatory clauses contained in the Boat Storage/Dockage License Agreement between Seven and Rahn were enforceable, and which precluded Seven's negligence claim against Suntex. *See* ECF No. [182]. At trial, the parties agreed that the standard applicable to Seven's claim against Suntex is gross negligence.

## II.  FINDINGS OF FACT

### A.  Reichen Kuhl

Kuhl is a 1996 graduate of the United States Air Force Academy. He served in the Air Force until 2001 and remained in the Reserves until 2004. After he left the Air Force, he taught, and then competed and won *The Amazing Race* in 2003. He was thereafter offered parts in television programs, in which he worked for approximately nine years. He is now an attorney and is the founder of a company called LeaseLock.

Kuhl grew up in Massachusetts and spent summers in Maine at a camp. He has been around boats his entire life. He first gained experience with an inboard/outboard boat similar to the Four Winns when he was twelve years of age as his parents bought such a boat in Maine. Kuhl has previous experience putting out a fire on a boat. When he was young, he and his mother were on a boat in Maine, when Kuhl saw smoke coming from the engine compartment and discovered a small fire in the carburetor. In that instance, he grabbed the fire extinguisher and put the fire out. Jason Shankman, Kuhl's fiancé, testified that Kuhl is generally very safety conscious and Kuhl takes boating safety seriously.

In Kuhl's many years of boating experience, he has never seen the engine hatches of an inboard/outboard boat opened after fueling, and no fuel attendant has ever asked him to open the hatches.

### B.  Suntex

In October/November of 2019, Suntex acquired the Bahia Mar Marina facility in Fort Lauderdale, and Suntex is the owner of the Bahia Mar Marina. Rahn is a wholly-owned subsidiary of Suntex, and operated the Bahia Mar Marina in January 2021.

### C.  Seven

Seven is a Florida limited liability company that was formed in May 2016. David MacNeil is the beneficial owner of the W, and the managing member, registered agent, and sole member of Seven. Seven purchased the W in July 2019. The W arrived in the United States in the fall of 2020. At the time of the fire, the W was moored behind the Limitation Vessel at the Bahia Mar Marina.

### D.  History of the Four Winns

Michael Boswell, the Four Winns' previous owner, purchased the Four Winns from Indian Springs Marina in October 2019. He testified that he does not know where Indian Springs got the boat – the only information available was that it had a sticker on it that said "trade." Boswell physically checked the boat prior to purchasing it but did not have a survey done by a marine surveyor or an inspection performed by a mechanic. At the time Boswell bought the Four Winns, it was in bad condition. The upholstery and seats were rotten, the fuel in it was bad, and neither engine would run. Boswell refurbished the Four Winns, which included repairing the inoperable engines. JC Boat Repairs replaced the throttle cables and installed a toggle switch to power the refrigerator.

In March 2020, after Boswell repaired the boat, he fueled the Four Winns and took his family to Punta Gorda, Florida to put the boat in the water and begin a trip. While the Four Winns was on the trailer on the boat ramp, Boswell started up the engines and blowers. At that time, a gasoline-fueled explosion and a fire took place in the Four Winns engine compartment on top of the fuel tank. Boswell testified that his daughter was sitting on the seat above the engine hatch when the explosion blew the hatch up, lifting his daughter to a standing position. He took his daughter out of the boat and extinguished the fire with a fire extinguisher. After the fire, Boswell replaced what he believed was the defect in the fuel system—a missing rivet in the sending unit

on the Four Winns' fuel gauge—and re-launched, restarted, and successfully operated the Four Winns the next day. Boswell was able to use the Four Winns the next day and continued to use the boat for another six months. During that time, he fueled the boat a dozen or two dozen times after the explosion. When fueling the boat after the March 2020 explosion, he opened the engine compartment and ran the blowers for four minutes before starting the engines. From the time Boswell replaced the sending unit until he sold the boat to Kuhl, Boswell had no issues with the Four Winns.

During the time Boswell owned and refurbished the boat, he replaced both fuel pump assemblies, the engines' exhausts, the engine impellers, the engine relays, the distributor caps, and rotors. For some of the repairs he made, he used automotive parts—for example, on the list of items he replaced, the distributor caps were listed with an AutoZone part number. He also replaced the line from the tank to the fuel pump for both engines, the fuse panel, and after the explosion, he installed two new blowers he purchased from West Marine. The sending unit that Boswell put into the Four Winns was the same sending unit in the boat when he sold it to Kuhl.

### E.  Sale of the Four Winns

Rick Mellen, the broker at All Florida Yacht Sales who worked with Boswell to sell the Four Winns to Kuhl, listed the boat in August of 2020. When Mellen arrived to perform the sea trial for Kuhl, there was a mechanic on board that he was told was looking everything over, and that everything was working as it should. Mellen testified that Boswell told him that the boat ran fine and did not tell him that the boat had previously exploded and caught on fire. Boswell was on land when Mellen took the boat out. Before delivering the boat to Kuhl, Boswell testified that he last put fuel in the boat in November 2020. Boswell did not believe that there were any mechanical or safety issues with the boat when he delivered it to Kuhl.

Kuhl was not aware of the work Boswell performed on the Four Winns or of the fire that occurred in March 2020. Boswell did not have any direct communication with Kuhl and did not advise him of the explosion or fire on the Four Winns in March 2020.

At the time of the sale, the Four Winns included a warning label near the steering wheel, required by 33 C.F.R. § 183.610(f).[3] Before purchasing the boat, Kuhl had only seen pictures and videos – he had never physically seen the boat. He did not commission a marine survey to be performed on the boat or had his own mechanic inspect it. He did not have a broker representing him during the purchase. Nobody informed Kuhl that an explosion and fire aboard the vessel took place in March 2020. Mellen told Kuhl that a mechanic had inspected the vessel and that everything was fine. The boat did not come with maintenance records, and Kuhl did not get an owner's manual with the boat, nor did he download one from the internet. Kuhl relied upon the representations made by Mellen as to the condition of the vessel. Kuhl requested that the boat be inspected by a mechanic before the sale and requested that Mellen take videos of the boat running for him to review.

Kuhl ultimately purchased the Limitation Vessel from Boswell through All Florida Yacht Sales on December 18, 2020, and had it delivered to his home in Fort Lauderdale. Boswell delivered the Four Winns to Kuhl's residence in Fort Lauderdale while Kuhl was in California. Kuhl then returned to Fort Lauderdale and first saw the Four Winns on January 10, 2021.

---

[3] 33 C.F.R. § 183.610(f) states that, "[e]ach boat that is required to have an exhaust blower must have a label that: (1) Is located as close as practicable to each ignition switch; (2) Is in plain view of the operator; and (3) Has at least the following information: WARNING – GASOLINE VAPORS CAN EXPLODE. BEFORE STARTING ENGINE OPERATE BLOWER FOR 4 MINUTES AND CHECK ENGINE COMPARTMENT BILGE FOR GASOLINE VAPORS."

**F.  The Explosion, Fire, and Aftermath**

The day before the fire, Kuhl spent several hours cleaning and checking the Four Winns –
he looked at the fire extinguisher and in the engine compartment. The boat had about an 1/8 of a
tank of fuel. Kuhl opened the engine compartment and he testified that everything looked normal
to him.

Kuhl took the Four Winns out for the first time on January 17, 2021. He lowered the boat
into the water and ran the blowers. He started the engines without incident and operated the boat
on a one-mile trip from his residence to the Bahia Mar Marina. During that time, he left the blowers
running because he was operating at low speed. He, Shankman, and their dogs arrived at the
Marina shortly before 10:30 a.m. and were met by William House, a Marina dockhand, and the
fuel dock operator.

After fueling, Kuhl started the Four Winns engines and walked toward the back of the boat
to untie the line. At trial, three videos were of the incident were introduced into evidence. Exhibit
1 shows one hour and twenty-six minutes of footage between approximately 10:27 a.m. and 12:00
p.m. from the Bahia Mar Roof Fuel Dock Overview, with the bow of the W and the Four Winns
fully visible; Exhibit 2 shows one hour and ten minutes of footage between approximately 10:50
a.m. and 12:00 p.m. from the Bahia Mar Roof E Dock Overview, with an obstructed partial view
of the W; and Exhibit 3 is a twenty-six minute extract between approximately 10:30 a.m. and 10:57
a.m. from the camera view in Exhibit 1. As reflected in Exhibits 1 and 3, approximately 7 to 10
seconds after Kuhl started the engines and moved toward the back of the Four Winns, the rear
engine compartment of the Four Winns exploded, causing a fire. The explosion in the engine
compartment occurred under Kuhl's feet, throwing him backward onto the deck of the boat.
Shankman grabbed Kuhl under the arms and pulled him out of the bilge. Kuhl and Shankman then

quickly grabbed their two dogs and hastily jumped off the Limitation Vessel onto the Marina fuel dock.

Once off the boat, House told them to run to the other side of the Marina. The Four Winns became engulfed in fire, burned through its mooring lines, and drifted down the dock and under the starboard bow of the W. Fort Lauderdale Fire and Rescue received an alarm regarding the fire at 10:44 a.m., arrived at the Marina at 10:51 a.m., and eventually extinguished the fire.

The Limitation Vessel was a total loss due to the fire, and the fire resulted in damage to the starboard hull of the W.

### G. Fueling Operation

In the course of fueling the Four Winns, House did not ask Kuhl to turn on the blowers or open the hatch. Kuhl testified that he did not notice any gasoline odors or fumes. He ran the blowers for a couple of minutes. Kuhl testified that he did not operate the blowers on the Four Winns for four minutes, as stated on the warning label pursuant to 33 C.F.R. § 183.610(f), because he was aware that the boat had large blowers and, based on his operating them about three times prior, he was confident in the blowers' ability to clear the small engine compartment. He did not open the engine hatch prior to fueling, though he testified that he would have followed House's directions if House had told him to do so.

At the time of the explosion, House was not next to the boat since he went to run Kuhl's credit card. When the boat exploded, House ran outside, and then ran back to the office to shut the fuel off. Once he shut off the fuel, House went to make sure Kuhl and Shankman were okay and instructed them to move away from the fuel dock. In terms of firefighting equipment, there were hoses and nozzles, two fire extinguishers, and a one-hundred-pound rollaway chemical fire

extinguisher on the fuel dock. There was a fire extinguisher on board the Four Winns. None of the equipment was used to attempt to extinguish the fire.

### H.  Training and Safety

Kuhl testified that he is safety conscious and had taken several boating safety courses while he owned two boats in California. He did not recall if the Four Winns had a Title 33 placard, but he testified that he would not have done anything differently, in any event.

Thomas Delotto is the Director of Safety and Compliance for Suntex and drafted the Suntex Marina Staff Training Manual ("Manual"), which was introduced into evidence as Exhibit 58. He created the Manual in 2019, in an effort to consolidate training directories and guides. The Manual is for industry awareness and informational purposes. In drafting, he selected the information included from general publications, Coast Guard regulations, and boating standards. Jeff Stukel is the General Manager of Bahia Mar Marina and has been working at marinas for over twenty years. He trained the staff on fueling at the Marina. He has fueled hundreds of vessels throughout his career and has never experienced a vessel fire. House was trained by Stukel on how to operate the fuel dock and House had reviewed Suntex's procedures for safe fueling.

Delotto testified that fuel attendants have to comply with the National Fire Protection Standard, which includes four obligations: (1) ensure no fuel is put in non-certified containers; (2) ensure a vessel is moored securely; (3) understand the dock equipment, including emergency action equipment, shutoffs, electrical disconnects, and any other safety equipment; and (4) stay within a certain distance of the vessel while fueling and keep it under observation. The master of the vessel is responsible for everything that takes place on board his vessel. The Manual delineates duties that apply to fuel attendants and to boat owners.

The Suntex Manual states, in pertinent part, as follows:

## Section 1

### General Marina Safety - continued

**FUELING OPERATIONS – GAS DOCK**

- ALWAYS ASK A FUEL DOCK CUSTOMER WHICH PRODUCT THEY NEEDED. Gasoline or Diesel.
- "Good Morning – do you need gasoline or diesel today please?" Then hand them the nozzle for that product.
- **CUSTOMERS MUST FUEL THEIR OWN BOATS.  NO EXCEPTIONS.**
- Customers should ONLY Fuel **PORTABLE TANKS** on the dock, not on or in the boat.
- Don't try to clean up gasoline spills by yourself – – inform your manager if you cause or see a spill.
- Before fueling, insure that customers close all compartments, hatches and windows.
- After fueling, request customers open everything up and ventilate thoroughly.
- Use your nose to see if you can detect any fumes.
- Insure customers run their bilge blowers for at least five minutes after fueling.
- When fueling, INSURE CUSTOMERS keep the nozzle of the pump in contact with the fill pipe.

Exh. 58 at 5.

Stukel testified that he did not "insure" that fuel attendants tell their customers to close compartments, hatches or windows, because the Marina does not control that aspect of the boat. He testified further that there are many provisions in the Manual that he does not believe pertained to the Bahia Mar Marina. He did instruct the attendants to make sure the customers' boat blowers were on after fueling but did not believe that five minutes was necessary.

With respect to safe fueling practices, the Manual states as follows:

Case No. 21-cv-60408-BLOOM/Valle

## Section 6
## Safe Fueling Practices



SUNTEX MARINAS

All employees of Suntex Marinas MUST ATTEND FUEL dispensing operations continuously and assist as needed. Customers should fill their own fuel tanks and are responsible for any spills that occur. Employees should make sure that all people are off the boat before dispensing fuel, and all smoking materials are extinguished.

1. Fueling is restricted to the fuel dock only. Adding fuel to, or removing fuel from, a boat may be carried out only at the fuel dock during operating hours.

2. Tie boat securely.

3. Stop engine and electrical equipment. No open flames. Remove gas caps or identify proper fueling receptacle.

4. No smoking within 100 feet of the fueling area.

5. Close all windows, doors and hatches.

6. Ask the customer if they want Gasoline or Diesel

7. Supply them with the correct nozzle – customers must fuel their own boats.

8. Insure the dispenser is operating and all READINGS AT ZERO prior to customer beginning to fuel their boat.

9. After fueling – insure boats are vented by opening windows, doors and hatches,

10. Run blowers 3 to 5 minutes.

11. Fuel spills must be cleaned up before starting engine.

12. YOU ARE IN CHARGE OF ALL ACTIVITY - Directions of FUEL DOCK attendant must be followed.

Proprietary to SUNTEX, SUNTEX MARINAS & SUNTEX MANAGEMENT in association with SUNTEX Marinas© 2019

Page 14

Exh. 58 at 14.

Stukel testified that this guidance is intended to be general guidance. He testified further that Marina personnel are in charge of dockside equipment and a customer is in charge of his own boat. The responsibility of the dock attendant is to make sure the Marina equipment is working properly, to hand the customer the nozzle, to ensure that the proper fuel goes in the boat, and make sure everything is turned off and the boat is tied up. House followed the Manual instructions that he felt were necessary. He did not stay by the Four Winns to ensure that Kuhl ran the blowers for three to five minutes after fueling. He also did not suggest to Kuhl that Kuhl open the engine hatch. With respect to firefighting, the Manual states as follows:

- Section 5 – continued
- Fire Safety-Fire Prevention-Fire Extinguisher Safety

Using a Fire Extinguisher

If you have the slightest doubt about your ability to fight a fire --- EVACUATE IMMEDIATELY!

Exh. 58 at 13.

## I. Expert Testimony

### a. Allen Richard

Seven presented testimony from Allen Richard, a boating safety and waterway management expert. Richard was an officer with the Florida Marine Patrol until he was promoted to the Marine Patrol Academy, where he taught all subjects pertaining to boating, including boating law, boating accident investigation, and boating accident reconstruction. He was promoted to lieutenant, and in addition to teaching, he was responsible for supervising recruits, and in-service law enforcement officers during in-service training. He was then promoted to captain and became the deputy boating safety coordinator for the State of Florida, which required that he review boating accident reports. He went to law school and obtained a law degree in 1994. He later worked

at the Fish and Wildlife Conservation Commission, where he was the boating safety and waterways management coordinator, and then became its general counsel. He retired in 2010, remained a reserve officer until June 2014, and now teaches admiralty.

Richard was retained to opine as to the proper procedures and precautions to be taken in fueling a boat from the dock side and the vessel side. According to Richard, the relevant authorities he relied on to determine safe fueling practices were *Chapman's Motor Boating and Sailing and Seamanship*, which states that before fueling, one should ensure that all hatches, doors, and windows are closed. Once fueling is finished, the openings should be opened to ventilate the boat and let gas fumes dissipate. According to Richard, safe fueling from a vessel operator's perspective includes disembarking passengers, opening the engine compartment, sniffing for gasoline fumes, and running the blowers for four to five minutes, then sniffing again. Safe fueling practices from the fuel dock's perspective in this case would have included following the guidance as set forth in the Marina Manual. Richard testified further that the Marina Manual is inconsistent with the times the blowers should be run, because in the Safe Fueling Practices section, it directs that the blowers should be run for three to five minutes, and in the General Marina Safety section, it states that the Marina should "insure customers run their bilge blowers for at least five minutes after fueling." Exh. 58 at 5, 14.

In Richard's opinion, safe fueling practices were not followed in this case by either Kuhl or House. Other than the fact that the engine compartment happened to be closed when Kuhl was fueling the Four Winns, Kuhl did not do any of the other things that Richard would consider to constitute safe fueling practices, including disembarking Shankman, opening the engine compartment after fueling, running the blowers for at least four minutes, and checking the engine compartment for gasoline fumes. In addition, Richard opined that House did not follow safe

fueling practices because he did not perform the important tasks set out in the Marina Manual section on Safe Fueling Practices, including ensuring that the engine hatches were opened after fueling to ventilate, and that the blowers were run for any length of time.

Richard also opined that at the time the fire started, Kuhl could have extinguished it with the fire extinguisher on the Four Winns. Richard also observed that House did not attempt to extinguish the fire. Richard conceded that there is no statute, rule, or regulation that requires a dock attendant to ensure a vessel owner runs the blowers for the requisite time, and there is no regulation that requires an injured boater to remain to fight a fire. Although not specifically retained to provide an opinion regarding the cause of the fire, Richard also conceded that he did not know the specific fuel source of the fire, or the fire's ignition source.

**b. Dennis Kerr**

Kuhl introduced expert testimony from Dennis Kerr, who investigates origin and cause of fires and explosions through his company, Kerr Fire Investigations. Kerr has performed fire investigations in the private sector since 1994, and through Kerr Fire Investigations since 2003. He was in the volunteer services from 1969 to 1997 as a junior firefighter. He then became a firefighter, engineer, lieutenant, captain, first assistant chief, chief, fire marshal, fire inspector, and was a live burn training instructor at the Fire Academy. In previous years, about 35% of his work involved marine fires, and more than half of his present work involves marine investigations and explosions. He estimated that he has conducted 2,800 to 3,000 fire investigations, and he is a Certified Fire Investigator and a Certified Fire and Explosion Investigator. Kerr offered his opinions as an expert on firefighting and fire investigation.

Kerr was not able to identify the fuel source of the fire or the ignition source of the fire on the Four Winns. According to Kerr, the blowers on the Four Winns would have exhausted the

engine compartment in less than a minute. He testified further that if the blowers had been operated

for four minutes instead of the approximate two and one-half minutes that Kuhl actually ran the

blowers, it would not have made a difference in this case. Kerr also testified that it was reasonable

for Kuhl not to attempt to extinguish the fire.

## III.    CONCLUSIONS OF LAW

Pursuant to Limitation of Liability Act, "the liability of the owner of a vessel for any claim,

debt, or liability described in subsection (b) shall not exceed the value of the vessel and pending

freight." 46 U.S.C. § 30505(a). The Act states further that,

> [u]nless otherwise excluded by law, claims, debts, and liabilities subject to
> limitation . . . are those arising from any embezzlement, loss, or destruction of any
> property, goods, or merchandise shipped or put on board the vessel, any loss,
> damage, or injury by collision, or any act, matter, or thing, loss, damage, or
> forfeiture, done, occasioned, or incurred, without the privity or knowledge of the
> owner.

46 U.S.C. § 30305(b). Whether a shipowner is entitled to limitation of liability involves a two-step

inquiry:

> First, the court must determine what acts of negligence or conditions of
> unseaworthiness caused the accident. Second, the court must determine whether the
> shipowner had knowledge or privity of those same acts of negligence or conditions
> of unseaworthiness.

*Hercules Carriers, Inc. v. Claimant State of Fla., Dep't of Transp.*, 768 F.2d 1558, 1563-64 (11th

Cir. 1985) (quoting *Farrell Lines, Inc. v. Jones*, 530 F.2d 7, 10 (5th Cir. 1976)). A claimant bears

the initial burden of proving negligence or unseaworthiness. *Id*. at 1564; *see also Coryell v. Phipps,*

317 U.S. 406, 409 (1943). The burden then shifts to the shipowner to prove lack of privity or

knowledge. *Id*.; *see also Petition of M/V Sunshine, II*, 808 F.2d 762, 764 (11th Cir. 1987) ("The

burden of proof of limitation is on [the shipowner]."). "A shipowner may not limit his liability

under the limitation act if his ship is unseaworthy due to equipment which was defective at the

start of the voyage." *Villers Seafood Co., Inc. v. Vest*, 813 F.2d 339, 343 (11th Cir. 1987). In that instance, an owner "is charged with knowledge of the existence of the condition." *Id*. In addition, a shipowner may be found to have privity or knowledge if "the means of obtaining knowledge exists, or where reasonable inspection would have led to the requisite knowledge." *Hercules Carriers, Inc.*, 768 F.2d at 1564. "Thus, knowledge is not only what the shipowner knows, but what he is charged with discovering in order to apprise himself of conditions likely to produce or contribute to a loss." *Id*.

By contrast, a shipowner seeking exoneration from liability must show that a loss is not attributable to the negligence of his crew, pilot, or vessel. *Id*. at 1582; *In re Caribbean Sea Transp.*, 748 F.2d 622, 666 (11th Cir. 1984), *modified on other grounds,* 753 F.2d 948 (11th Cir. 1985); *In re Tittle,* 544 F.2d 752, 755 (5th Cir. 1977).

## IV.   DISCUSSION

### A.   Kuhl's Claims

#### i.   <u>Exoneration</u>

Kuhl asserts that he is entitled to exoneration because Seven failed to prove that he was at fault, and failed to prove causation, by a preponderance of the evidence. *See* ECF No. [199] at 13. But a review of the applicable case law indicates that in order to demonstrate an entitlement to exoneration, the burden is on the shipowner—in this case Kuhl—to show that entitlement. *See Hercules Carriers, Inc.*, 768 F.2d at 1582 ("In order for Hercules to achieve complete exoneration under the Limitation of Liability Act it would have to prove that the accident was not attributable to the negligence of its crew or the pilot."); *In re Caribbean Sea Transp., Ltd*. 748 F.2d at 626 ("An owner will be exonerated from liability when he, his vessel, and crew are found to be completely free from fault.") (citation omitted). Here, the evidence shows that something—

whether a defect or an error—while not precisely identified, contributed to the fire that caused the W's damages. As such, Kuhl has not demonstrated that he or his vessel are completely free from fault, and that he is therefore entitled to exoneration. Thus, the Court considers next whether Kuhl is nevertheless entitled to limitation of liability.[4]

### ii.   <u>Limitation of Liability</u>

In order to determine if limitation of liability is warranted in this case, the Court must first determine the acts of negligence or conditions of unseaworthiness that caused the accident. Seven, as the claimant, bears the initial burden of proving such negligence or unseaworthiness. In this case, Seven faces a significant hurdle since there is no direct evidence as to the cause of the explosion and resulting fire on board the Four Winns.

### a.   **Negligence**

#### 1.   <u>Safe fueling practices</u>

At trial, Seven sought to establish that Kuhl was negligent in failing to follow safe fueling practices by failing to run the blowers for at least four to five minutes, failing to open the engine hatch after fueling, failing to check the bilge and engine compartment for gasoline vapors or fuel, and failing to turn off the engines when one of them was "running rough." However, the evidence presented at trial does not support such a finding.

First, the evidence does not support a finding that there is a minimum time during which a boat owner must run the blowers on his boat, or that a boat owner must open the engine hatch and check the bilge and engine compartment. The Code of Federal Regulations ("CFR") requires that a boat with an exhaust blower have a warning label that states, at a minimum,

---

[4] The parties stipulated that the Limitation Vessel was a total loss due to the fire. ECF No. [183] at 18 ¶ 65. Because the claimed value of the Limitation Vessel is $0, the practical effect of exoneration and limitation is the same in this case.

WARNING – GASOLINE VAPORS CAN EXPLODE. BEFORE STARTING ENGINE OPERATE BLOWER FOR 4 MINUTES AND CHECK ENGINE COMPARTMENT BILGE FOR GASOLINE VAPORS.

33 C.F.R. § 183.610. But the CFR does not direct that a boat operator must operate the blower for four minutes or check the engine compartment bilge for gasoline vapors. In this case, there is no dispute that the Four Winns featured the requisite warning label. Richard, Seven's boating safety expert, testified that the four-minute timeframe in the CFR is a "rule of thumb" for vessels like the Four Winns. While the CFR requires that a vessel like the Four Winns feature a warning label, there is no separate statute, rule, or regulation that requires a boat owner to run the blowers for a particular amount of time. Similarly, there is no statute, rule, or regulation requiring a boat owner to open the engine hatch or check the bilge and engine compartment. Critically, and as further detailed below, there was no evidence presented with respect to the actual cause of the explosion and fire, or that Kuhl's failure to run the blowers for four minutes as stated on the CFR warning label contributed to the explosion and fire.

Second, the evidence does not support a finding that Kuhl did not follow safe fueling practices. Although Richard testified that in his opinion safe fueling practices were not followed because Kuhl did not disembark his passengers, open the engine compartment, check for gasoline fumes, or run the blowers for at least four minutes, there was no evidence introduced at trial that any of these failures caused the explosion and resulting fire on the Four Winns. In fact, even though Richard was not specifically retained to provide an opinion regarding the cause of the explosion and fire, Richard conceded that he did not know the specific fuel source for the fire or the fire's ignition source.

Moreover, Kuhl testified that he has been around boats his entire life, and he has experience with inboard/outboard boats like the Four Winns. Boswell testified that he installed two brand new

blowers in the Four Winns before he sold it to Kuhl. Kuhl testified that he was aware that the Four Winns had large blowers. After refueling the Four Winns, Kuhl ran the blowers for approximately two and one-half minutes. Kerr, Kuhl's firefighting and fire investigation expert, testified that the blowers in the Four Winns would have successfully cycled the air in the engine compartment twice in the time that Kuhl actually ran them, and therefore ventilated the engine compartment. Critically, Kerr testified further that, in his opinion, running the blowers for the full amount of suggested time or opening the engine hatch would have made no difference in this case.

Third, although Stukel testified that Kuhl told him that one of the engines was "running rough" before the fire and explosion on the Four Winns, the Court does not find the testimony to be credible. Kuhl denies saying that the engine was running rough and testified that he spoke to no one after House instructed him and Shankman to leave the fuel dock following the explosion and fire. Moreover, the videos of the incident in Exhibits 1 and 3 show Kuhl starting the engines without incident and standing and heading toward the back of the boat; about seven seconds later, the explosion occurs. Even if Kuhl had made the remark, it is not clear what effect an engine "running rough" had in this case, since there is no evidence of the actual cause of the explosion.

2. Duty to Ensure the Four Winns Was Seaworthy

Seven's next claim of negligence is that Kuhl failed to comply with his duty to ensure that the Four Winns was seaworthy, by failing to obtain a marine survey prior to purchase, by failing to have a mechanic check the boat, by failing to speak to Boswell, relying on Mellen's representations, and by failing to inspect the Four Winns prior to purchase. The evidence at trial does not support a finding of negligence upon this claim either. As there was no evidence with respect to the cause of the explosion and fire on the Four Winns, there is no indication that a survey prior to purchase or an inspection by Kuhl would have revealed an issue with the Four Winns.

Such conclusions would constitute speculation. Similarly, there is no indication that speaking to Boswell would have revealed any issue with the Four Winns, since Boswell did not disclose the March 2020 explosion to anyone until he was deposed in connection with the instant case in September 2021. In addition, Kuhl's reliance upon Mellen was not unreasonable since the evidence shows that Mellen told Kuhl that a mechanic had looked at the Four Winns and "everything was working as it should." Moreover, Kuhl specifically requested that Mellen conduct and film a sea trial on the Four Winns, which Mellen did without incident, and which Kuhl reviewed prior to purchase. Kuhl testified that he inspected the engine compartment after the boat was delivered to his residence and found everything to be in order based upon his previous boating experience.

### 3.  Failure to Extinguish the Fire

Seven's final claim is that Kuhl was negligent for failing to extinguish the fire on the Four Winns. However, the evidence does not support this conclusion either.

Seven's boating safety expert, Richard, testified that at the time that Kuhl was lying on the deck of the Four Winns, he could have extinguished the fire with the fire extinguisher on board the Four Winns. However, the Court does not find that such a conclusion is justified for two reasons. First, Richard was not qualified as a fire expert, and Kerr, Kuhl's fire investigation and firefighting expert, testified that it was reasonable for Kuhl to leave the Limitation Vessel and not stay behind to attempt to extinguish the fire. Specifically, Kerr testified that

> There's no way that Mr. Kuhl is going to stand there after an explosion, look for a fire extinguisher, and discharge the fire extinguisher to try to extinguish that fire. People don't do that. If there's an explosion in this room right now, I'm thinking everybody's heading for the exits and nobody is looking for a fire extinguisher. That's a traumatic experience, even for a firefighter. When you're going into a fire or explosion, you're -- you know, it gets a little tense. But somebody that's not a firefighter, no. The best thing is to flee and get everybody off the boat.

ECF No. [203] at 142.

Second, the videos of the incident are inconsistent with Richard's assessment. The videos of the incident depicted in Exhibits 1 and 3 show that the explosion was forceful enough to blow the engine compartment of the Four Winns upward and knock Kuhl back toward the front of the boat. In addition, within approximately twelve seconds of the explosion, the flames were extensive and visible coming out of the engine compartment. Considering that the Four Winns had just been filled with fuel, it would not be reasonable to expect Kuhl, who was lifted and thrown back by the explosion in the Four Winns' fuel compartment, burned, and injured by the explosion, to be capable of remaining on board or nearby to attempt to extinguish the fire.

As a result, the Court finds that Seven failed to prove that the explosion and fire resulted from any negligence attributable to Kuhl.

### b. Unseaworthiness[5]

At trial, Seven also sought to establish that the Four Winns was unseaworthy at the start of the voyage because the cause of the spark that caused an almost identical explosion and fire on the Four Winns when Boswell owned it was never discovered or remedied. Boswell testified that he installed distributor caps in the Four Winns that were listed with AutoZone part numbers, and Richard testified that it would not be a good idea to put non-spark protected automobile parts in a boat. However, there was no evidence introduced at trial that the distributor caps caused or played any part in the explosion and fire on the Four Winns.

Moreover, there was no evidence at trial of the cause of the explosion and fire in March of 2020, nor was there any evidence presented as to the cause of the later explosion and fire on the Four Winns when it was owned by Kuhl. Both Richard and Kerr testified that neither of them could identify either the fuel source or the ignition source that caused the explosion and fire at the

---

[5] Notably, Seven did not allege a theory of unseaworthiness in its Amended Claim. *See* ECF No. [27].

Bahia Mar Marina. Accordingly, the evidence is insufficient to support a finding that the Four Winns was unseaworthy.

### c.  *Res ipsa loquitur*

Despite the lack of direct evidence regarding the cause of the explosion and fire, Seven contends that Kuhl was negligent because a seaworthy vessel does not explode and catch fire on its own. Thus, according to Seven's theory, the Court may employ the doctrine of *res ipsa loquitur* to find that Seven has satisfied its burden. Kuhl disputes that the doctrine is applicable in this case. Generally, the doctrine is one of "extremely limited applicability" to be used in "rare instances." *City of New Smyrna Beach Util. Comm'n v. McWhorter*, 418 So. 2d 261, 262 (Fla. 1982). "A finding of negligence based on the doctrine of *res ipsa loquitur* in the admiralty context is not totally unique but neither is it routine." *United States v. Baycon Indus., Inc.*, 804 F.2d 630, 633 (11th Cir. 1986).

To determine if *res ipsa loquitur* applies, the Court applies a three-part test: "(1) the injured party was without fault, (2) the instrumentality causing the injury was under the exclusive control of the defendant, and (3) the mishap is of a type that ordinarily does not occur in the absence of negligence." *Baycon Indus., Inc.*, 804 F.2d at 633 (citing *Johnson v. United States*, 333 U.S. 46 (1948)). "The initial burden is on the plaintiff to establish that the circumstances attendant to the injury are such that, in the light of past experience, negligence is the probable cause and the defendant is the probable actor." *Goodyear Tire & Rubber Co. v. Hughes Supply, Inc.*, 358 So. 2d 1339, 1342 (Fla. 1978). "Given the restrictive nature of the doctrine, a court should never lightly provide this inference of negligence." *McWhorter*, 418 So. 2d at 262.

Assuming that *res ipsa* may be properly applied in this context, Seven fails to demonstrate that such an application is warranted. The parties do not dispute the first two elements of the test—

that Seven was without fault, and that the instrumentality causing the injury, here the Four Winns, was under the exclusive control of Kuhl. Nevertheless, the Court concludes that the third part of the test is not met – that the explosion and fire "is of a type that ordinarily does not occur in the absence of negligence." At trial, Seven claimed that the Four Winns was unseaworthy because, even after the repairs were made by Boswell after the explosion in March 2020, there remained an ignition source on the Four Winns that was never located or repaired. However, there was no evidence presented at trial as to the cause or the ignition source of the explosion on the Four Winns, or with respect to any defect in the equipment on the Four Winns. Boswell testified that he believed that some automobile parts are the same as marine parts, and that the distributor caps he installed on the Four Winns appeared on the list of items replaced with an AutoZone part number, but he also testified that it was not likely that he purchased them from AutoZone. In *Terry v. Carnival Corporation*, 3 F. Supp. 3d 1363, 1372-73 (S.D. Fla. 2014), the court found the application of *res ipsa loquitur* to be warranted where a fire broke out in the engine room of a cruise ship. However, there it was undisputed that the subject fire resulted from a leak in a fuel hose for one of the diesel generators. By contrast, the cause of the fire here remains in dispute, and there was no evidence that the explosion and fire that occurred at the Bahia Mar Marina resulted from the use or installation of automobile parts in the Four Winns.

Moreover, there is no evidence to support an inference that an explosion ordinarily does not occur absent some type of negligence. Indeed, the evidence presented at trial demonstrates that following the March 2020 explosion and repairs, Boswell operated the Four Winns for an additional six months without incident and after refueling at least three times. In addition, Kuhl was able to start the Four Winns without incident before driving it to the Bahia Mar Marina fuel dock approximately a mile away from his home. Finally, the videos in Exhibits 1 and 3 depicting

the explosion and resulting fire demonstrate that the Four Winns started up and ran without incident for between seven to ten seconds before the explosion occurred. As such, the evidence does not support an inference of negligence.

In any event, "[t]o produce liability, the acts of negligence or conditions of unseaworthiness must be a contributory or proximate cause of the accident." *Hercules Carriers, Inc.*, 768 F.2d at 1266. The evidence at trial simply does not support the inference that negligence on the part of Kuhl contributed to or was the proximate cause of the explosion and fire in this case. As such, the application of *res ipsa loquitur* is not warranted.

### d. Knowledge or Privity

Even if the evidence were sufficient to demonstrate negligence or unseaworthiness, to preclude limitation, the Court would have to conclude that Kuhl had privity or knowledge of those same acts of negligence or conditions of unseaworthiness. "The shipowner's privity or knowledge is not measured against every fact or act regarding the accident; rather, privity or knowledge is measured against the specific negligent acts or unseaworthy conditions that actually caused or contributed to the accident." *Suzuki of Orange Park, Inc. v. Shubert*, 86 F.3d 1060, 1064 (11th Cir. 1996) (citing *Farrell Lines, Inc.*, 530 F.2d at 10). "[K]nowledge is not only what the shipowner knows but what he is charged with discovering in order to apprise himself of conditions likely to produce or contribute to a loss." *Hercules Carriers, Inc.*, 768 F.2d at 1564.

Upon review, Kuhl sufficiently established that he lacked privity or knowledge of any of the potential and speculative causes of the fire posited by Seven. First, there was no evidence presented at trial that the alleged failure to follow safe fueling practices (including failure to properly ventilate the engine space, run the blowers for the recommended four minutes, check and ensure that no fuel had entered the bilge or engine space, or failure to open the engine hatch) caused

or contributed to the fire. Although Richard testified that in his opinion safe fueling practices were not followed in this case, there was no evidence presented at trial that would establish that the failure to follow those practices contributed to or caused the fire. Indeed, there was no evidence presented at trial regarding the actual cause of the explosion and fire. With respect to Seven's claim of negligence regarding ventilating the engine space, Kerr's testimony supports the conclusion that no additional efforts to ventilate the engine compartment would have made a difference.

Second, there was no evidence at trial to support the conclusion that Kuhl's failure to inspect the Four Winns, or to insist on a survey, caused or contributed to the explosion and fire. There is no legal requirement that Kuhl obtain a marine survey on the Four Winns, nor was there any evidence that his reliance on Mellen's representations was improper. Indeed, Kuhl testified that he was told that a mechanic had inspected the Four Winns and that everything was working well. Kuhl also specifically requested and reviewed videos of the Four Winns operating without any issues before he purchased the vessel. In addition, Kuhl testified that once he purchased and was in possession of the Four Winns, he opened the engine compartment, looked inside, and based upon his experience with boats, everything appeared to be in order. Moreover, the evidence demonstrates that Boswell repaired the Four Winns after the March 2020 fire, and was able to operate it without incident for six months without any indication of a defective condition.

Indeed, without any evidence as to the cause of the explosion or fire, the Court simply cannot conclude that Kuhl had actual or constructive knowledge of any otherwise unknown defect that may have caused the fire and explosion. Accordingly, the Court concludes that Kuhl is entitled to limitation of liability.

### B.  Seven's Counterclaim against Kuhl for Negligence

Seven's counterclaim for negligence against Kuhl fails for the same reasons that the Court concludes that Seven has failed to demonstrate any negligence that would preclude Kuhl from limiting his liability.

### C.  Seven's Third-Party Claim against Suntex for Gross Negligence

Seven asserts a claim against Suntex for gross negligence based on several grounds, including the failure to have the following safety measures in place at the fuel dock: proper supervision of fueling, proper procedures, protocols, and/or fire suppression equipment, properly trained staff to respond to the fire, and procedures to ensure that persons using the dock had sufficient knowledge and skill in fueling their vessel. Seven contends that Suntex had a non-delegable duty to ensure that fueling operations were conducted in a safe manner.

"[G]ross negligence is that act or omission which a reasonable, prudent man 'would know would probably and most likely,' result in an injury to another." *Glaab v. Caudill*, 236 So. 2d 180, 182 (Fla. 2d DCA 1970). In order to prove gross negligence, Seven must establish the following:

1. A composite of circumstances which, together, constitutes an 'imminent' or 'clear and present' danger amounting to more than normal and usual peril;

2. A showing of chargeable knowledge or awareness of the imminent danger; and

3. The act or omission complained of must occur in a manner which evinces a 'conscious disregard of consequences,' as distinguished from a 'careless' disregard thereof (as in simple negligence) or from the more extreme 'willful or wanton' disregard thereof (as in culpable or criminal negligence).

*Greathouse v. Ceco Concrete Const., L.L.C.*, No. 5:06cv2-RS-AK, 2007 WL 624550, at *3-4 (N.D. Fla. Feb. 23, 2007), *aff'd sub nom.*, 232 F. App'x 957 (11th Cir. 2007) (citations omitted).

The evidence at trial does not support a finding of gross negligence on the part of Suntex. At trial, Seven sought to establish the first element of gross negligence by presenting a composite

of circumstances, including the previous explosion when Boswell owned the boat, his use of automotive parts in the Four Winns, Kuhl's failure to follow safe fueling practices, House's failure to advise Kuhl to open the engine hatch or to run the blowers, House's failure to ensure that Kuhl ran the blowers for the full amount of time recommended, and Stukel's failure to instruct fuel attendants to tell customers to open hatches and to turn on the blowers. However, upon review, the evidence fails to establish how this particular composite of circumstances constituted an imminent or clear and present danger amounting to more than normal and usual peril. While the Court agrees generally that fueling operations carry some risk because of the flammable nature of gasoline, the Court does not agree that *any* fueling operation must therefore constitute an imminent or clear and present danger, or that the particular chain of circumstances posited by Seven presented a clear or imminent danger in this case. Indeed, the testimony of House and Stukel at trial demonstrates the opposite – hundreds of fueling operations took place at Bahia Mar for years prior without incident, despite their practice of not telling vessel owners to open hatches or run the blowers or staying to ensure compliance with Suntex safety guidelines. Contrary to Seven's contentions at trial, the failure to abide by every provision in the Manual is not sufficient to warrant a finding of gross negligence, as opposed to arguably simple negligence, since "a party's internal rule does not itself fix the legal standard of care in a negligence action." *Mayo v. Publix Super Markets, Inc.*, 686 So. 2d 801, 802 (Fla. 4th DCA 1997). Nor does the "failure to apply certain safety standards" by itself constitute gross negligence. *Flood v. Young Woman's Christian Ass'n of Brunswick, Ga., Inc.*, 398 F.3d 1261, 1266 (11th Cir. 2005).

The evidence also shows that in spite of what Seven contends was clear and imminent danger, Boswell operated the boat without incident for six months after making necessary repairs to the Four Winns, Kuhl was able to operate the Four Winns without incident over the distance of

approximately one mile from his house to the Marina, and the boat started up without incident for several seconds before the explosion occurred. As such, there is simply no evidence in this case to support a finding that any of the facts Seven points to alone or collectively contributed to the explosion and fire on the Four Winns.

Even if the Court were to conclude that Seven presented sufficient evidence to establish the first factor relevant to gross negligence, the evidence is nevertheless insufficient to establish that Suntex had chargeable knowledge or awareness of any imminent danger in refueling the Four Winns. In order to sustain a finding of chargeable knowledge or awareness on the part of Suntex, there must be some evidence that a similar incident had occurred in the past. *Cent. State Transit & Leasing Corp. v. Jones Boat Yard, Inc.*, 206 F.3d 1373, 1377 (11th Cir. 2000) (affirming finding of gross negligence where the evidence showed that the party "knew that the dry dock had exhibited potentially serious defects on four separate occasions prior"). Here, there is no evidence that the Marina, House, or Stukel, had experienced any explosion, or a similar explosion and fire, when fueling a vessel over hundreds of refueling operations. None of the parties in this case knew about the previous March 2020 explosion on the Four Winns until Boswell was deposed in September 2021. As such, the evidence is insufficient to establish any chargeable knowledge on the part of Suntex.

Finally, given that the unrebutted evidence in this case demonstrates that no similar explosion had ever occurred at the Marina, or over the course of hundreds of fueling operations attended by House and Stukel, the Court cannot conclude that the acts or omissions that Seven complains of evince a conscious disregard of consequences.

### V.      CONCLUSION

Accordingly, and for the foregoing reasons, the Court finds that Kuhl is entitled to limitation of liability. Seven has failed to establish its claims of negligence against Kuhl and gross negligence against Suntex. The Court will enter judgment by separate order.

**DONE AND ORDERED** in Chambers at Miami, Florida, on July 28, 2022.

_____
**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to:

Counsel of Record